IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANDREW M. GAINER**, and **WENDY GAINER**, | Case No. 3:14-cv-01346-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **CITY OF TROUTDALE**, **SCOTT ANDERSON**, **NICK BOHRER**, **RODNEY WILKERSON**, **NICHOLAS THOMPSON**, and **TIM FUJI**, | |
| Defendants. | |

Montgomery W. Cobb, MONTGOMERY W. COBB, LLC, 1001 SW Fifth Avenue, Suite 1100, Portland, OR 97204. Of Attorneys for Plaintiffs.

Gerald L. Warren, LAW OFFICE OF GERALD WARREN, 901 Capitol Street NE, Salem, OR 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs Andrew M. Gainer ("Mr. Gainer") and Wendy Gainer ("Ms. Gainer")

(collectively "Plaintiffs") bring this action under 42 U.S.C. § 1983 against City of Troutdale (the

"City"), Police Chief Scott Anderson ("Chief Anderson"),  Officer Nick Bohrer ("Officer

Bohrer"), Sergeant Rodney Wilkerson ("Sergeant Wilkerson"), Officer Nicholas Thompson

("Officer Thompson"), and Officer Tim Fuji ("Officer Fuji") (collectively "Defendants").
Plaintiffs assert a total of nine claims against Defendants.[1] Mr. Gainer alleges three federal
claims: (1) violation of the Fourth Amendment right to be free from unreasonable searches and
seizures; (2) failure to supervise; and (3) violation of the Fourteenth Amendment right to equal
protection. Mr. Gainer alleges five state tort claims: (1) false arrest; (2) assault; (3) battery;
(4) malicious prosecution; and (5) negligence. Ms. Gainer alleges one state tort claim: loss of
consortium. Defendants move for summary judgment on all claims. For the reasons stated below,
the Court grants Defendants' motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine
dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view
the evidence in the light most favorable to the non-movant and draw all reasonable inferences in
the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th
Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the
drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling
on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of
the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,
255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for
the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

---

[1] In their response to Defendants' motion for summary judgment, Plaintiffs abandoned
Ms. Gainer's claim for intentional infliction of emotional distress.

## BACKGROUND

The following facts are undisputed by the parties. Sometime in the late hours of August 19 or the early hours of August 20, 2013, Mr. Gainer hit Travis Steele in the face. On August 21, 2013, Mr. Steele went to the Troutdale Police Department and spoke with Officer Bohrer. Mr. Steele provided Officer Bohrer with medical records showing that Mr. Steele had reported to the emergency department of Oregon Health Science University ("OHSU") on August 20, 2013, with a broken jaw and would need reconstructive surgery. On August 22, 2013, Officer Bohrer, Officer Fuji, and Sergeant Wilkerson (who was Officer Bohrer's direct supervisor) arrested Mr. Gainer without a warrant immediately outside of the house Mr. Gainer shares with Ms. Gainer, his long-term partner (but, legally speaking, not his wife), and their daughter. At the time of the arrest, three people—Mr. Steele, Jennifer Flauding, and Brandon Armstrong—all claimed to have seen Mr. Gainer punch Mr. Steele without provocation.

After being read his *Miranda* rights, Mr. Gainer admitted that he punched Mr. Steele in the face, but Mr. Gainer also explained that Mr. Steele swung at him first. Mr. Gainer was incarcerated, and a Grand Jury indicted him on August 30, 2013. Dkt. 28-2 at 33. After Mr. Armstrong recanted his earlier statement, the District Attorney dismissed the charges against Mr. Gainer. Mr. Gainer now argues that he was arrested without probable cause. Mr. Gainer asserts that the Troutdale Police Department targeted him because in August 2012, he filed an ethics complaint against former Troutdale Mayor Jim Knight. According to Mr. Gainer, the police may also have targeted him because he had been involved in some discussions with the Oregon Liquor Control Commission about local bars complying with the terms of their licenses. *See* Dkt. 48-1.

Officer Bohrer was the investigating officer.  He started as a reserve officer in 2010 and became a full-time officer in November 2012. On August 21, 2013, Officer Bohrer interviewed

two people, Mr. Steele and Ms. Flauding, in the lobby of the Troutdale Police Department.

Officer Bohrer observed that the left side of Mr. Steele's face was visibly swollen. Mr. Steele

reported that on the night of August 19, 2013, Mr. Gainer assaulted him in the gravel parking lot

of the Brass Rail Tavern in Troutdale, Oregon. Mr. Steele told Officer Bohrer that he was

standing in the parking lot while Mr. Gainer talked to Ms. Flauding. Mr. Steele further told

Officer Bohrer that while Mr. Steele had his back turned away from Mr. Gainer, Mr. Gainer

"sucker punched him" from behind. Mr. Steele stated that he had gone to OHSU for treatment

and that x-rays showed that he had a mandibular fracture and an occipital bone fracture from a

facial blow. While Mr. Steele talked to Officer Bohrer, Officer Bohrer observed him spit blood

several times.

　　　　Ms. Flauding corroborated Mr. Steele's account of the night of August 19, 2013. She also

told Officer Bohrer that after Mr. Gainer punched Mr. Steele, she responded by hitting

Mr. Gainer three or four times. She further told Officer Bohrer that she had helped Mr. Steele

leave the parking lot and get into her car. She showed Officer Bohrer dried blood on the inside of

her car on the passenger-side door, the dash area, the driver-side door, and the steering wheel.

Officer Bohrer took photographs of the blood. Ms. Flauding also told Officer Bohrer that

Mr. Gainer is a "high ranking martial artist" and has randomly assaulted other people in the past.

　　　　After the interview with Mr. Steele and Ms. Flauding, Officer Bohrer went to the gravel

parking lot of the Brass Rail Tavern. He looked for blood but did not find any. Additionally, he

spoke with a bartender who remembered hearing about an altercation but did not know any

specifics. In his deposition, Officer Bohrer stated that he did not have any knowledge about

Mr. Gainer before interviewing Mr. Steele and Ms. Flauding.

Also on August 21, 2013, Mr. Armstrong called the Troutdale Police Department. Mr. Armstrong spoke with Officer Thompson. Mr. Armstrong said that as he stood in the gravel parking lot of the Brass Rail Tavern, he had seen someone named "Andy" punch "Travis" while they were in the upper lot, which is about 40 feet away from the gravel parking lot. Dkt. 47-6 at 13. According to Mr. Armstrong, "Travis" had done nothing to provoke the punch. Officer Thompson made his report about Mr. Armstrong's call part of the case file, which was available to Officer Bohrer, the primary officer for the incident. Officer Bohrer did not participate in the phone call with Mr. Armstrong and did not read Officer Thompson's report. Officer Bohrer did, however, become aware of the report's contents sometime before the morning of August 22, 2013. Dkt. 47-6 at 12-14, 24.

On August 22, 2013, Officer Bohrer, Officer Fuji, and Sergeant Wilkerson went to the Gainers' home around 6:30 AM with the intention of arresting Mr. Gainer if he stepped outside of his house. The officers did not have an arrest warrant. Officer Fuji went inside the Gainer's fenced backyard in case Mr. Gainer decided to run out the back door. Officer Bohrer and Sergeant Wilkerson went to the Gainers' front door, and one or both of them knocked several times. Mr. Gainer heard knocking on the door for approximately two minutes. Dkt. 28-1 at 46. Mr. Gainer, dressed in pants but without shoes or a shirt, opened the front door and saw the two officers wearing full police gear. Although Officer Wilkerson had his Taser drawn and held down at his right side, Mr. Gainer does not assert that he ever saw the Taser.

Officer Bohrer asked if they could briefly speak with Mr. Gainer. When Mr. Gainer requested to get a shirt on first, one of the officers said it would "only be a minute," and Mr. Gainer then stepped outside. Mr. Gainer asserts that because he has experience training police officers in martial arts and because some members of his family are or were in law enforcement,

he "knew" that his house was surrounded and felt that he had "no choice" but to obey the officers' instructions. Dkt. 42 ¶ 5. According to Mr. Gainer, he believed the officers would use force to "ensure [his] compliance." *Id.* As soon as Mr. Gainer stepped outside, Officer Bohrer handcuffed him. Mr. Gainer does not assert that he suffered any physical injuries during handcuffing and stated that the officers "were very respectful." Dkt. 28-1 at 57.

After his arrest, Mr. Gainer told Officer Bohrer that he had he had been drinking at the Brass Rail Tavern on the night of August 19, 2013, and had danced with Ms. Flauding.[2] Then, according to Mr. Gainer, around midnight, he had left the bar and started to walk home. After he left the bar, two men and Ms. Flauding chased him down South Buxton Road. Near 146 South Buxton Road, one of the men, Mr. Steele, swung at Mr. Gainer. Mr. Gainer blocked the punch with his arm and then then hit Mr. Steele on the left side of his face. Mr. Gainer tripped and fell, and Ms. Flauding started kicking him. Mr. Gainer called the police after the incident, but when two officers responded to his home, he said he no longer needed any assistance.

During his post-arrest interview, Mr. Gainer said he was injured during the incident, but Officer Bohrer examined Mr. Gainer's head and upper torso and did not see any sign of injury. Officer Bohrer told Mr. Gainer that he did not believe Mr. Gainer's story because witnesses said the incident happened in the parking lot of the Brass Rail Tavern and Mr. Gainer said it happened further up the street. Mr. Gainer offered to show Officer Bohrer his cell phone log showing that he called the police after midnight on August 20, 2013, but Officer Bohrer did not look at the Mr. Gainer's cellphone. Officer Bohrer also did not continue his investigation by

---

[2] Mr. Gainer notes that although a video of the interview taken in Officer Bohrer's patrol car confirms that Mr. Gainer said Ms. Flauding asked him to dance, Officer Bohrer erroneously wrote in his report that Mr. Gainer said he had asked Ms. Flauding to dance.

trying to identify and interview other potential witnesses based on only first names that

Mr. Gainer gave him.[3]

Mr. Gainer was charged with Assault II, a Measure 11 crime, which is a felony. He was

incarcerated for 21 days until his attorney obtained a court order reducing bail to an amount that

Mr. Gainer could afford to pay. A further investigation, conducted after the Grand Jury

indictment, confirmed Mr. Gainer's version of the incident and showed that Mr. Steele, Ms.

Flauding, and Mr. Armstrong had lied to Officer Thompson, Officer Bohrer, and the Grand Jury

about the incident.[4] In December 2013, the District Attorney dropped all charges against Mr.

Gainer. This civil lawsuit followed.

---

[3] At oral argument on January 5, 2016, Plaintiffs' counsel asserted that Mr. Gainer also offered to show Officer Bohrer a text message from Ms. Flauding in which she admitted to kicking Mr. Gainer. *See* Dkt. 43-5 at 14. According to Plaintiffs' counsel, this text message was forwarded to Mr. Gainer before his arrest. The text message, however, was sent from Ms. Flauding to Trina Antonpoulos, and no evidence in the record suggests that Mr. Gainer had the text message on his phone at the time of his arrest. Mr. Gainer's defense counsel, Jacob Wieselman, discussed the text message in a letter to the District Attorney dated October 9, 2013, but stated that the text message came from Ms. Flauding's iPhone. Dkt. 43-5 at 2 n.3. In the excerpt of Mr. Gainer's deposition submitted with Plaintiffs's response to Defendants' motion, Mr. Gainer does not assert that he had a copy of Ms. Flauding's text message on his phone or that he offered to show such a text message to Officer Bohrer. Dkt. 49-1 at 56. In the excerpt of Officer Bohrer's deposition submitted with Plaintiff's response to Defendants' motion, Officer Bohrer only discusses Mr. Gainer's claim that he had records of 9-1-1 calls on his phone; no mention is made of Ms. Flauding's text message. Dkt. 47-6 at 25. When Officer Bohrer was asked about Ms. Flauding's text message, *id.* at 33, neither Officer Bohrer nor counsel suggests that the text message was on Mr. Gainer's phone on August 22, 2013. Regardless of whether the text message was on Mr. Gainer's phone on August 22, 2013, the text message contains no information about whether Mr. Gainer punched Mr. Steele without provocation.

[4] Mr. Armstrong recanted his entire story, admitting that he had not actually witnessed Mr. Gainer hit anyone. Dkt. 26-1 at 3-4. Mr. Steele and Ms. Flauding admitted that they had concealed the identity of a third male at the scene of the incident but continued to maintain that Mr. Gainer had punched Mr. Steele without provocation. *Id.* at 9-11.

**DISCUSSION**

**A.  Federal Claims**

To establish a violation of 42 U.S.C. § 1983, Mr. Gainer must prove that Defendants acted under color of state law and deprived Mr. Gainer of his constitutional rights. *See Dawson v. City of Seattle*, 435 F.3d 1054, 1061 (9th Cir. 2006). Mr. Gainer argues that Defendants violated his Fourth and Fourteenth Amendment rights by executing a warrantless arrest at his home without probable cause, failing to supervise and train Officer Bohrer, and arbitrarily treating Mr. Gainer differently than other similarly-situated individuals.

**1.  Warrantless Arrest**

Mr. Gainer argues that the officers improperly arrested him without a warrant at his home. The Fourth Amendment prohibits warrantless felony arrests *within* the home "absent probable cause and exigent circumstances." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984). The threshold of the home marks the line that police officers may not reasonably cross without a warrant unless exigent circumstances are present. *Payton v. New York*, 445 U.S. 573, 590 (1980). By opening the door to his or her dwelling, however, a person exposes him or herself to a public place. *United States v. Vaneaton*, 49 F.3d 1423, 1427 (9th Cir. 1995). After a person has exposed him or herself to a public place, police officers may execute a warrantless arrest provided that the "officers use no force, threats, or subterfuge" to influence "a suspect's decision to open the door." *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007). Under these circumstances, the suspect may be seized outside the home or "just inside the threshold" of the house. *Vaneaton*, 49 F.3d at 1425.

Mr. Gainer does not dispute that he opened the door of his house and stepped outside before the officers arrested him. He argues, however, that he only stepped outside because he felt threatened and that the officers did not have probable cause to arrest him. The questions that

must be answered to determine whether Mr. Gainer's arrest violated the Fourth Amendment are:

(1) whether the officers coerced Mr. Gainer into opening his door and stepping outside by use of

force or threats;[5] and (2) whether the officers had probable cause to make the arrest.

### a. Coercion

Mr. Gainer argues that he felt threatened because he saw that the officers had on their full

gear, including external ballistic vests and guns. According to Mr. Gainer, these circumstances

constitute coercion and make his warrantless arrest unconstitutional. The Ninth Circuit has

recognized a constructive *Payton* violation when a suspect opens the door to his or her home

"under circumstances of extreme coercion." *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th

Cir. 1985). For example, a constructive *Payton* violation occurred when police officers, acting

without a warrant, completely surrounded a home with weapons drawn and used a bullhorn to

order a suspect to leave his home and drop to his knees. *Al-Azzawy*, 784 F.2d at 892-93. In these

circumstances, "the officers' show of force and authority was overwhelming" and "[a]ny

reasonable person would have believed he was under arrest." *Id.* at 893. In contrast, the Ninth

Circuit found that police officers did not use coercion to cause a suspect to open the door when

officers arrived at the suspect's motel room wearing their uniforms and with their guns in their

holsters. *Vaneaton*, 49 F.3d at 1425. Additionally, a simple request that a suspect exit his or her

home does not rise to the level of coercion. *Hart v. Parks*, 450 F.3d 1059, 1065 (9th Cir. 2006).

---

[5] The warrantless of arrest of a person who opens the door of his or her home may violate the Fourth Amendment if: (1) the police use force or threats to cause the suspect to open the door; or (2) the police use subterfuge to cause the suspect to open the door. In his Second Amended Complaint, Mr. Gainer does not allege that the officers used subterfuge to cause him to open or step outside his door. The Court therefore does not reach the question whether the officers used subterfuge by making the statement that Mr. Gainer should step outside because questioning would only "take a minute," even though Officer Bohrer intended to arrest Mr. Gainer the moment he crossed the threshold.

Although Mr. Gainer saw that Officer Bohrer and Sergeant Wilkerson were wearing their full police uniforms, he did not see either officer draw a weapon. The officers did not use a bullhorn to demand that Mr. Gainer leave his home. The officers asked him to step outside, and he complied. The officers did not make an overwhelming show of force and authority, nor would these circumstances have led any reasonable person to believe he or she was under arrest. Thus, Mr. Gainer voluntarily exposed himself to a public place by opening his door and stepping over the threshold of his front door. As in *Hart*, all admissible evidence shows that Mr. Gainer "was asked to leave his house and did so free from coercion, let alone free from 'circumstances of extreme coercion' commensurate with those presented in *Al-Azzawy*." *Hart*, 450 F.3d at 1065.

### b.  Probable Cause

Mr. Gainer also argues that the officers arrested him without probable cause. A warrantless arrest requires probable cause. *United States v. Brobst*, 558 F.3d 982, 990 (9th Cir. 2009). Probable cause exists "if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *Al-Azzawy*, 784 F.2d at 894 (quoting *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir.1984)); *see also United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."). Probable cause does not require certainty, nor is it a "beyond a reasonable doubt" standard. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). Officers "may not ignore exculpatory evidence that would 'negate a finding of probable cause,'" but "[t]he mere existence of some evidence that could suggest self-defense does not negate probable cause." *Id.* (citations omitted). The determination

whether probable cause exists "is based upon the information the officer had at the time of making the arrest." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).

The Ninth Circuit has stated that a probable cause determination "necessarily turns upon the particular facts of the individual case, and prior decisions generally are of little help in deciding a specific case." *John*, 515 F.3d 939 at 941. Still, Ninth Circuit precedent is instructive because the Ninth Circuit has found probable cause to exist in other cases with facts similar to those presented here.

In *Yousefian*, 779 F.3d at 1010, the plaintiff arrestee called the police to report that his father-in-law had attacked him. The police responded and saw an elderly man (the father-in-law) lying on the floor, bleeding profusely from a wound to his head. The plaintiff had no serious injuries and declined medical care. Everyone agreed that the plaintiff struck the father-in-law in the head with a glass candle-holder. The plaintiff explained that he struck his father-in-law in self-defense after the father-in-law began to hit the plaintiff with a cane. The father-in-law and his wife, however, told police that no such provocation had occurred. The plaintiff was arrested for assault with a deadly weapon, booked, and released on bond. At trial, a jury acquitted the plaintiff of the assault and elder abuse charges. The plaintiff then brought a civil lawsuit for false arrest. The district court granted summary judgment for the defendant, and the Ninth Circuit affirmed. The Ninth Circuit held that "notwithstanding the self-defense claim," no reasonable jury could have concluded that probable cause for the arrest was lacking. *Id.* at 1014-15.

In *John*, 515 F.3d 936, a police officer made a warrantless arrest of a school teacher, the plaintiff, for sexually molesting a ten-year-old student. The plaintiff was handcuffed at the school where she taught, confined for 36 hours, and then released after the district attorney declined to prosecute. The officer made the arrest after receiving a report from the school

principal that the plaintiff had intercepted a note from the student accusing the plaintiff of being a "lesbian" and a "perv" (presumably meaning "pervert"). The plaintiff showed the note to the principal, and the principal requested a police investigation. The officer interviewed the student before making any arrest. Based on the officer's experience interviewing victims of sexual abuse, the student's description of events, and the student's consistency and accuracy without the officer detecting exaggeration, fabrication, or deception, the officer concluded that the student was a genuine victim of sexual abuse. The officer also believed that the note from the student corroborated the student's account of the molestation. Looking at the totality of the circumstances, the Ninth Circuit reversed the district court's finding that the officer did not have probable cause for an arrest. *Id.* at 942.

In *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), police officers found the plaintiff at a shopping mall, where six months before, he had been evicted and permanently banned. The officers arrested the plaintiff, and he was charged with, among other things, misdemeanor trespass. After the plaintiff spent three months in jail, all charges were dropped. The Ninth Circuit affirmed the district court's grant of summary judgment on the issue of whether probable cause existed to arrest the plaintiff. The Ninth Circuit noted that "it appears an actual conviction for trespass might have been difficult without additional evidence. . . . Ultimately, however, our inquiry is not whether [the plaintiff] *was* trespassing. Rather, it is whether a reasonable officer had probable cause to think he could have been." *Id.* at 474-75 (emphasis in original). The officers knew that the plaintiff had been issued a "Notice Forbidding Trespass" and that the shopping mall security officer had requested that the plaintiff be placed under arrest. These facts, known to the officers at the time of arrest, were sufficient to allow the

officers reasonably to believe they had probable cause to arrest the plaintiff for trespass. *Id.* at 475.

Here, at the time of the arrest, Officer Bohrer had the statements of Mr. Steele, Ms. Flauding, and Mr. Armstrong. Although there was an inconsistency between where Mr. Armstrong said the assault took place and where Mr. Steele and Ms. Flauding said it occurred, all three witnesses stated that Mr. Gainer had punched Mr. Steele in the face without provocation. Officer Bohrer also examined Mr. Steele's medical records, which showed that Mr. Steele suffered a severe facial blow. Moreover, Officer Bohrer observed Mr. Steele spitting blood in the lobby of the police department and saw blood in Ms. Flauding's car. Upon Mr. Gainer's arrest, Mr. Gainer admitted to Officer Bohrer that he had hit Mr. Steele in the face. Officer Bohrer could not see any visible injuries on Mr. Gainer to support Mr. Gainer's contention that he had been attacked and acted only in self-defense. This is not a case like that of *Arpin v. Santa Clara Valley Transportation Agency*, where officers accepted an "unexamined charge" from an alleged victim. 261 F.3d 912, 925 (9th Cir. 2001). Physical evidence and two additional witness statements supported Mr. Steele's charge. Probable cause to arrest Mr. Gainer existed.

Plaintiffs attach to their response the declaration of Ronald J. Miller, a licensed private investigator. Mr. Miller concludes that Officer Bohrer "did not comply with accepted investigative standards for the establishment of probable cause for arrest." Dkt. 47-2 at 19. Where, as in this case, the facts are undisputed, probable cause is a question of law for the court. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (holding that what is "objectively reasonable" for an officer to do under the Fourth Amendment is "a pure question of law"); *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003) ("[W]here the material, historical facts are not in

dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to decide whether probable cause existed . . . .”); *c.f. Ornelas v. United States*, 517 U.S. 690, 696 (1996) (“The first part of the analysis [of whether probable cause exists] involves only a determination of historical facts, but the second [the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause] is a mixed question of law and fact . . . .”). Therefore, Mr. Miller’s opinion is not the type of expert opinion that the Court would rely upon under Federal Rule of Evidence 702. Nor, for that matter, is the opinion of defense attorney Jacob Wieselman, who states in his declaration that the government’s failure to turn over a copy of the video of Mr. Gainer’s arrest and interrogation constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Dkt. 47-3 ¶ 3.

The Court does not intend to minimize the serious effect that this unfortunate incident must have had upon Mr. Gainer and his family. To be escorted by the police from his home shirtless and in handcuffs and confined for 21 days must have had a devastating effect upon Mr. Gainer’s personal reputation and sense of well-being, and the event would have justifiably distressed both his long-term partner and his daughter. Still, “the probable cause inquiry is an objective one,” and courts look only to whether information available at the time of the arrest would have led a reasonable officer to conclude that the suspect had committed a crime. *John*, 515 F.3d at 942. For the reasons stated above, the Court concludes that the information available to Officer Bohrer when he made the arrest would have led a reasonable officer to believe that Mr. Gainer had committed an offense against Mr. Steele.[6]

---

[6] After the arrest, officers eventually learned that Mr. Steele, Ms. Flauding, and Mr. Armstrong made false reports to the police in violation of Oregon law. Or. Rev. Stat. (“ORS”) § 162.375. The proper remedy for this violation, however, is not a lawsuit against the

### 2.  Incarceration and Prosecution after the Arrest

Mr. Gainer also argues that his incarceration and prosecution after the arrest was without probable cause and violated his Fourth Amendment rights. Mr. Gainer asserts that Officer Bohrer's failed to include additional details and names of witnesses in his report and failed to forward the video or audio of Mr. Gainer's post-arrest interview to either the prosecutor or defense counsel. This information, argues Mr. Gainer, should have led Officer Bohrer or the prosecutor to conduct further investigation, which would have dissipated probable cause after Mr. Gainer's arrest even if probable cause existed at the time of the arrest. Mr. Gainer cites *United States v. Ortiz-Hernandez* in support of his position that once Officer Bohrer should have continued to investigate or even released Mr. Gainer once Mr. Gainer provided evidence that the alleged assault might have been self-defense. 427 F.3d 567, 574-75 (9th Cir. 2005) (affirming the district court's finding that probable cause dissipated where there was "no evidence in the record that the police took post-arrest measures, such as obtaining a body cavity search order, to confirm that [the arrestee] had swallowed balloons containing heroin").

The evidence in this case, however, is strikingly similar to the evidence found sufficient to support probable cause for prosecution in *Yousefian*. 779 F.3d at 1014. There, the Ninth Circuit held that "there was indisputably probable cause to arrest and prosecute [the arrestee] for assault." *Id.* The Ninth Circuit based this determination on the facts that a police officer found "an elderly and infirm man bleeding profusely from a head wound admittedly inflicted by a younger man without significant injuries" and that the victim and his wife had "told the officers at the scene that [the younger man] had attacked [the victim] without provocation." *Id.* Under these circumstances, regardless of the arrestee's assertion of self-defense, "no reasonable jury

---

officers who relied on the false reports. Plaintiffs could have brought civil claims directly against Mr. Steele, Ms. Flauding, and Mr. Armstrong.

could conclude that there was no probable cause for the arrest or *for prosecution*" for assault. *Id.* at 1015 (emphasis added).

Despite the information supplied by Mr. Gainer during his post-arrest interview, three people still claimed that Mr. Gainer, who acknowledged having extensive skills in martial arts, had hit Mr. Steele without provocation; Mr. Gainer still admitted to hitting Mr. Steele; Mr. Steele still had medical records showing a severe facial blow; and Officer Bohrer still had observed blood in Ms. Flauding's car. Although Mr. Gainer's information suggested that he acted only in self-defense, the claim of self-defense did not negate probable cause for his continued incarceration and prosecution. Probable cause did not dissipate until further investigation revealed that Mr. Steele, Ms. Flauding, and Mr. Armstrong had supplied incomplete or false information to the police. At that point, all prosecution ceased.

### 3.  Equal Protection

Mr. Gainer asserts a "class-of-one" equal protection claim under the Fourteenth Amendment. According to Mr. Gainer, there is no rational reason for why Officer Bohrer willfully remained ignorant of relevant evidence, arrested Mr. Gainer without probable cause, or failed to follow up on the information Mr. Gainer provided after his arrest. The Supreme Court has recognized class-of-one equal protection claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000).

Mr. Gainer has not, however, presented evidence that he was intentionally treated differently from similarly-situated individuals. Although Defendants could have done a more thorough job in investigating the complaint against Mr. Gainer, for the reasons already discussed, a reasonable officer could have concluded the probable cause existed to arrest and detain Mr. Gainer. This is all that the law requires. After additional facts about the complaint came to light,

PAGE 16 – OPINION AND ORDER

the District Attorney dropped the charges against Mr. Gainer. Nothing in the record suggests that before Mr. Gainer's arrest, Officer Bohrer knew anything about Mr. Gainer other than the information reported by Mr. Steele, Ms. Flauding, and Mr. Armstrong. Mr. Gainer's claims that he was intentionally singled out without justification are not supported.

### 4. Supervision and Training of Officer Bohrer

Mr. Gainer argues that Officer Bohrer violated Mr. Gainer's Fourth and Fourteenth Amendment rights by arresting and imprisoning Mr. Gainer without probable cause and that as supervisors and advisors, Chief Anderson, Sergeant Wilkerson, and Officer Fuji are liable for failing adequately to supervise Mr. Gainer's investigation. Mr. Gainer further argues that the City is liable because it failed adequately to train Officer Bohrer. Mr. Gainer points out that although Officer Bohrer had been a reserve officer for two years and a full-time officer for nine months before Mr. Gainer's arrest, Officer Bohrer did not finish his basic certification application until seven days after the arrest. According to Mr. Gainer, because of Officer Bohrer's relative inexperience, his supervisors and co-workers should have familiarized themselves with the facts of Mr. Gainer's case and made an independent determination regarding probable cause. These failures, argues Mr. Gainer, resulted in the omission of evidence from Defendant Bohrer's report and later *Brady* violations during the litigation of the criminal case.

A supervisor "can be held liable in his individual capacity 'for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation[;] or for conduct that showed a reckless or callous indifference to the rights of others.'" *Blankenhorn*, 485 F.3d at 485 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)) (alteration in original). If a subordinate causes a constitutional deprivation, a supervisor's liability "depends upon whether he 'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably

should have known, would cause others to inflict the constitutional injury.'" *Id.* (quoting

*Watkins*, 145 F.3d at 1093). Similarly, a city may be liable for the constitutional torts of its

employees under § 1983 where its "failure to train amounts to deliberate indifference to the

rights of persons with whom the [employees] come into contact." *Dawson*, 435 F.3d at 1065

(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal quotation marks omitted)

(alteration in original).

Plaintiffs, however, cannot establish a claim of failure to supervise or train under § 1983

without first showing a deprivation of a constitutional right. Supervisors and municipalities are

not liable where the actions of subordinate officers did not cause any constitutional injury. *See*

*Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in his

individual capacity, . . . [the plaintiff] must show that [the defendant supervisor] was deliberately

indifferent to the need to train subordinates, and the lack of training actually caused the

constitutional harm or deprivation of rights."); *Dawson*, 435 F.3d at 1065 ("Because we conclude

that [the police officers'] search did not deprive Plaintiffs of any constitutional right, however,

Plaintiffs cannot, as a matter of law, establish a valid § 1983 claim against [the county].").

Because the Court finds that no subordinate officer's actions resulted in a constitutional

violation, Chief Anderson, Sergeant Wilkerson, Officer Fuji, and the City are not liable for any

failure to supervise or train.[7]

---

[7] Because the Court finds that no triable issues regarding probable cause or constitutional violations exist, the Court does not reach Defendants' qualified immunity argument. The Court notes, however, the Ninth Circuit's statement in *Peng*: "If we had doubts about probable cause, we would still reach the same conclusion because . . . '[e]ven absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful . . . .'" *Peng*, 335 F.3d at 980 (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991)).

### B.  State Claims

Plaintiffs concede that the evidence does not show that the individual defendants acted outside the scope of their employment and thus all state law tort claims must be dismissed against all defendants except the City under the Oregon Tort Claims Act. ORS § 30.265(2)-(3).

#### 1.  False Arrest or Imprisonment, Assault, and Battery

Plaintiffs concede that the individual officers did not use excessive force in arresting Mr. Gainer. Plaintiffs further concede that if probable cause for Mr. Gainer's arrest existed, the Court should dismiss the claims for false arrest or imprisonment, assault, and battery. In Oregon, probable cause exists if the person who initiates criminal proceedings against another "reasonably believes that the person accused has acted or failed to act in a particular manner" and either (1) "correctly believes that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused" or (2) "mistakenly so believes in reliance on the advice of counsel." *Gustafson v. Payless Drug Stores Nw., Inc.*, 269 Or. 354, 356-57 (1974) (quoting *Varner v. Hoffer*, 267 Or. 175, 179 (1973)) (internal quotation marks omitted).

Because the Court—as discussed above—finds that Officer Bohrer reasonably believed that Mr. Gainer committed a crime and therefore had probable cause to arrest Mr. Gainer, the Court dismisses these state tort claims. *See Gigler v. City of Klamath Falls*, 21 Or. App. 753, 762 (1975) ("Indispensable proof of the causes of action [assault and battery, false arrest, false imprisonment, malicious prosecution, and outrageous conduct] plaintiff asserts under these assignments is that the action taken against him was without probable cause.").

#### 2.  Malicious Prosecution

According to Mr. Gainer, the City perpetrated a malicious prosecution against him because no probable cause existed for the initial arrest and the continued incarceration after Mr.

Gainer had proffered evidence disputing Mr. Steele's story. Mr. Gainer further alleges the City

acted with improper purposes to "teach [him] a lesson" and for reasons other than having

probable cause to believe he was guilty. Dkt. 18 ¶ 43. In order to recover for the tort of malicious

prosecution, a plaintiff must prove six elements:

> (1) the institution or continuation of the original criminal
> proceedings; (2) by or at the insistence of the defendant; (3)
> termination of such proceedings in the plaintiff's favor; (4) malice
> in instituting the proceedings; (5) lack of probable cause for the
> proceeding; and (6) injury or damage because of the prosecution.

*Rose v. Whitbeck*, 277 Or. 791, 795, *mod. on other grounds* 278 Or. 463 (1977). "Proof of

probable cause" serves as "a complete defense to the action [of malicious prosecution]."

*Gustafson*, 269 Or. at 356; *see also Yousefian*, 779 F.3d at 1014 ("The absence of probable cause

is a necessary element of § 1983 false arrest and malicious prosecution claims.").

 The Ninth Circuit also has discussed liability for malicious prosecution under § 1983

when an officer "maliciously or recklessly makes false reports to the prosecutor." *Blankenhorn*,

485 F.3d at 482. Even "'where police officers do not act maliciously or with reckless disregard

for the rights of an arrested person,'" they may be liable for damages suffered by the arrested

person after a district attorney files charges if "'the presumption of independent judgment by the

district attorney is rebutted.'" *Id.* (quoting *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981)).

The presumption is rebutted by, for example, showing that an officer "provided false

information" to the prosecutor or made material omissions. *Id.* The false information or

omissions must, however, be "legally relevant to whether there was probable cause to charge [the

plaintiff] with [a crime]." *Id.* at 483.

 As discussed, the Court has determined that probable cause to arrest and incarcerate

Mr. Gainer existed. The false information or omissions alleged by Mr. Gainer are that Officer

Bohrer failed to include in his report that he found no blood in the gravel parking lot of the Brass

Rail Tavern, that Mr. Gainer had called 9-1-1 after the incident in the early hours of

August 20, 2013, that the bartender at the Brass Rail Tavern told Officer Bohrer that he heard

about an altercation, and that Mr. Gainer gave Officer Bohrer the first names of other potential

witnesses. None of this omitted evidence would, however, have so undermined the physical

evidence and the statements of Mr. Steele, Ms. Flauding, and Mr. Armstrong as to negate

probable cause for Mr. Gainer's continued incarceration and prosecution. Despite the omissions

by Officer Bohrer, probable cause did not dissipate until further investigation revealed that Mr.

Steele, Ms. Flauding, and Mr. Armstrong had made false reports to the police. Upon that

discovery, the District Attorney acted appropriately and dropped all charges against Mr. Gainer.

There is no genuine issue for trial of malicious prosecution.

### 3. Negligence

Although a plaintiff may plead alternative theories of liability under state common law

and § 1983, courts in this district do not allow a plaintiff to proceed with a cause of action for

negligence based solely on the same facts underlying his or her § 1983 claim. *Whitfield v. Tri-*

*Metro. Transp. Dist.*, 2009 WL 839484, at *10-11 (D. Or. Mar. 30, 2009). Here, Mr. Gainer

bases his negligence claim on the same facts as his § 1983 claims.

Additionally, even if Mr. Gainer had pled separate facts for his negligence claim, a

negligence claim generally requires physical injury. *Lowe v. Philip Morris USA, Inc.*, 207 Or.

App. 532, 540-45, (2006) *aff'd*, 344 Or. 403 (2008). In the absence of a *physical* injury, Oregon

law recognizes a negligence claim only in certain circumstances:

> This court [the Oregon Supreme Court] has recognized common
> law liability for psychic injury alone when defendant's conduct
> was either intentional or equivalently reckless of another's feelings
> in a responsible relationship, or when it infringed some legally
> protected interest apart from causing the claimed distress, even
> when only negligently.

*Norwest, By & Through Crain v. Presbyterian Intercommunity Hosp.*, 293 Or. 543, 558-59 (1982) (footnotes omitted). These sorts of "responsible relationships" include the physician-patient relationship, *Curtis v. MRI Imaging Servs. II*, 148 Or. App. 607, 618 (1997), *aff'd*, 327 Or. 9 (1998), or a relationship involving a "specific duty imposed by statute for the benefit of individuals previously identified by a judicial order." *Nearing v. Weaver*, 295 Or. 702, 707 (1983). Mr. Gainer has not alleged, let alone shown a genuine factual dispute regarding, the type of relationship with the City that would allow him to establish negligence in the absence of physical injury. Nor has Mr. Gainer shown a genuine issue concerning the invasion of some legally protected interest. His negligence claim fails.

### 4. Ms. Gainer's Loss of Consortium Claim

Loss of consortium is a "derivative" claim; "it arises only as the result of injury to the other spouse." *Casey v. Manson Const. & Eng'g Co.*, 247 Or. 274, 292 (1967); *see also Knepper v. Brown*, 213 Or. App. 598, 609 (2007), *aff'd*, 345 Or. 320 (2008) (noting that a loss of consortium claim is entirely dependent on the resolution of the other spouse's claims). Without Mr. Gainer's claims, Ms. Gainer may not assert loss of consortium. Because Mr. Gainer has failed to present a genuine issue of material fact concerning any of his claims, Ms. Gainer's claim, too, must fail.

In addition, Oregon law only has recognized claims for loss of consortium by an injured person's spouse. *See Shoemaker v. Mgmt. Recruiters Int'l, Inc.*, 125 Or. App. 568, 572 (1993) ("[A] claim for loss of consortium is based on injuries peculiar to a plaintiff that were the consequence of tortious injury suffered by the plaintiff's *spouse*.") (emphasis added). The claim for loss of consortium is based on the theory "that, by virtue of marriage, a spouse receives certain benefits both tangible, as in material services, and intangible, such as companionship and affection, from the other spouse." *Axen v. Am. Home Products Corp. ex rel. Wyeth-Ayerst Labs.*,

158 Or. App. 292, 310, *opinion adhered to as modified on reconsideration sub nom. Axen v. Am. Home Products Corp.*, 160 Or. App. 19 (1999). No Oregon appellate court has opined on whether this theory might be extended to encompass the benefits conferred by committed long-term unmarried partners.

Ms. Gainer is Mr. Gainer's long-time partner, and the two have a daughter together. They are not, however, married. Although Ms. Gainer argues that the Oregon Supreme Court "would" recognize such an action for a non-married life partner if it had the chance, she does not cite any Oregon cases in support of her argument. Dkt. 57 at 64. The Court cannot accept Ms. Gainer's invitation to create a new state cause of action without any guiding case law, even in dicta, from an Oregon appellate court.[8]

## CONCLUSION

Defendants' Motion for Summary Judgment (Dkt. 23) is GRANTED.

**IT IS SO ORDERED**.

DATED this 8th day of January, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[8] In a diversity case, the Court must follow state law. Where there is no state statute on point and the state's highest court has not decided the question, federal courts must follow state intermediate appellate courts in interpreting state law "in the absence of convincing evidence that the highest court in the state would decide differently." *Stoner v. New York Life Insurance Co.*, 311 U.S. 464, 467 (1940). If there is no state appellate law, the Court must decide what the state's supreme court would likely do. Still, there must be something on which the federal court can base its decision. The federal court's duty "is to ascertain and apply the existing [state law], not to predict that [the state] may change its law." *Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1479 (9th Cir. 1995) (quoting *Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346 (9th Cir.1974)) (internal quotation marks omitted). Ms. Gainer did not ask the Court to certify this question to the Oregon Supreme Court. Additionally, because the Court could also decide this claim based solely on the derivative nature of a loss of consortium claim, the Court does not find it necessary to certify the question.